Jennifer Seraphine (Cal Bar. No. 245463)
(seraphine@turnerboyd.com)
TURNER BOYD LLP
2570 W. El Camino Real
Suite 380
Mountain View, California 94040
Telephone: (650) 521-5930
Facsimile: (650) 521-5931

Todd M. Malynn (Cal. Bar No. 181595)
(tmalynn@feldmangale.com)
FELDMAN GALE, P.A.
Promenade West
880 W 1st Street, #315
Los Angeles, California 90012
Telephone: (213) 625-5992
Facsimile: (213) 625-5993

*Attorneys for Plaintiff Ripple Labs, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RIPPLE LABS, INC.,<br>F/K/A OPENCOIN, INC.,<br>A CALIFORNIA CORPORATION,<br><br>        Plaintiff,<br><br>        vs.<br><br>LACORE ENTERPRISES, LLC,<br>A TEXAS LIMITED LIABILITY<br>COMPANY;<br>RIPPLN, INC., A TEXAS<br>CORPORATION; AND<br>TERRY LACORE, AN INDIVIDUAL,<br><br>        Defendants. | Case No. 3:13-cv-5974-KAW<br><br>**PLAINTIFF'S NOTICE OF MOTION<br>AND MOTION FOR PRELIMINARY<br>INJUNCTION; MEMORANDUM OF<br>POINTS AND AUTHORITIES**<br><br>**Hearing Date: February 6, 2013, 11:00 a.m.**<br>**Courtroom:    4, 3rd Floor**<br>**Judge:        Hon. Kandis A. Westmore** |

# TABLE OF CONTENTS

Page No.

**NOTICE OF MOTION AND MOTION** ............................................................................... 1

**RELIEF REQUESTED** ..................................................................................................... 1

I.       SUMMARY OF THE ARGUMENT ............................................................... 2

II.      STATEMENT OF FACTS ................................................................................. 3

    A.  Plaintiff Ripple Labs and the Ripple Trademark ............................................. 3

    B.  Ripple Labs Has Extensively Promoted Its Services Using the RIPPLE Mark And RIPPLE Domain Names ............................................................................... 5

    C.  The Defendants' Infringing Scheme .................................................................. 6

    D.  Defendants' Wrongful and Infringing Conduct ................................................ 7

    E.  Actual Confusion is Occurring at an Increasingly Exponential Rate ................ 8

    F.  Defendants Advertise Themselves as Being Associated With Monetary and Currency Exchange Services Leading to Further Actual Confusion ................................. 11

III.    ARGUMENT ................................................................................................... 12

    A.  Legal Standard ................................................................................................ 12

    B.  Ripple Labs Will Prevail On Its Section 1114 and 1125 Trademark Infringement Claims ................................................................................................................. 13

        1.  The Evidence Of Actual Confusion Strongly Favors An Injunction ......................... 14

        2.  the RIPPLE Trademark Is Strong And Well Known Nationwide .............................. 15

        3.  Defendants Are Using The Identical Name RIPPLE And The Nearly Identical Mark RIPPLN ......................................................................................................... 16

        4.  Defendants Have Acted In Bad Faith ...................................................................... 16

        5.  Defendants' Services Are Related To The Services Offered Under The RIPPLE Trademarks And Are Promoted To The Same Consumers In Overlapping Channels Of Trade ................................................................................................ 18

        6.  DEFENDANTS INTEND ON EXPANDING THEIR SERVICES TO FURTHER COMPETE WITH  RIPPLE LABS ............................................................... 18

    C.  Ripple Labs Will Also Prevail On Its Unfair Business Practices Claims ........................ 19

    D.  Ripple Labs Has Suffered Irreparable Harm If An Injunction Is Not Granted ................ 20

    E.  The Balance Of Hardships and Public Interest Strongly Favors Ripple Labs ................. 22

    F.  It Is Within the Court's Discretion to Decline to Require a Bond Or, At a Minimum, to Require a Nominal Bond ................................................................................ 23

1

IV.        CONCLUSION ............................................................................................................ 24

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Cases**

*Accuride International, Inc. v. Accuride Corp.*,
871 F.2d 1531 (9th Cir. 1989)...................................................................... 13, 14

*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979)......................................................... 13, 14, 16, 18

*Amoco Production Co. v. Gambell*,
480 U.S. 531 (1987) ..................................................................................... 22

*Anti-Monopoly, Inc. v. General Mills Fun Group*,
611 F.2d 296 (9th Cir. 1979)........................................................................ 13

*Apple Computer, Inc. v. Formula Int'l Inc.*,
725 F.2d 521 (9th Cir. 1984)................................................................. 20, 22

*Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*,
633 F.2d 746 (8th Cir. 1980)........................................................................ 23

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*,
174 F.3d 1036 (9th Cir. 1999)................................................................ passim

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
973 P.2d 527 (Cal. 1999) ............................................................................. 20

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*,
840 F.2d 701 (9th Cir. 1988)........................................................................ 23

*Chronicle Pub Co., v. Chronicle Publications Inc.*,
733 F.Supp. 1371 (N.D.Cal. 1989) .............................................................. 14

*Clamp-Swing Pricing Co. v. Super Mkt. Merch. & Supply, Inc.*,
2013 U.S. Dist. LEXIS 166638 (N.D. Cal. Nov. 21, 2013)................... 21, 22

*Color Me House, Inc. v. Discovery Communs., Inc.*,
2013 U.S. Dist. LEXIS 44234 (W.D.Wash. March 27, 2013) ...................... 15

*Community Assisting Recovery, Inc. v. Aegis Ins. Co.*,
92 Cal.App. 4th 886 (2001).......................................................................... 19

*Dreamwerks Prod. Group, Inc. v. SKG Studio*,
142 F.3d 1127 (9th Cir. 1998)...................................................................... 16

*Emery v. Visa Internet Service Ass'n*,
95 Cal. App. 4th 952 (2002).......................................................................... 19

*Entrepreneur Media, Inc. v. Smith*,
279 F.3d 1135 (9th Cir. 2002)...................................................................... 17

*Farmers Ins. Exch. v. Sup. Ct.*,
826 P.2d 730 (Cal. 1992) ............................................................................. 20

*GoTo.com, Inc. v. Walt Disney Co.,*
 202 F.3d 1199 (9th Cir. 2000).................................................................. 16, 23, 24

*Grocery Outlet, Inc. v. Alberston's, Inc.,*
 497 F.3d 949 (9th Cir. 2007)............................................................................ 12

*GSC Logistics, Inc. v. Star Galaxy Logistics, Inc.,*
 C 09-5886 SBA, 2010 WL 690200 (N.D. Cal. Feb. 24, 2010)........................ 15

*Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.,*
 No. 12-16868 (9th Cir. Dec. 2, 2013)............................................................. 12

*Internet Specialties West, Inc. v. Milon-Digiorgio Enters,*
 559 F.3d 985 (9th Cir. 2009)........................................................................... 22

*Interstellar Starship Servs., Ltd. v. Epix, Inc.,*
 184 F.3d 1107 (9th Cir. 1999).......................................................................... 16

*Jorgensen v. Cassiday,*
 320 F.3d 906 (9th Cir. 2003)............................................................................ 24

*Kasky v. Nike, Inc.,*
 27 45 P.3d 243 (Cal. 2002).............................................................................. 20

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery,*
 150 F.3d 1042 (9th Cir. 1998).......................................................................... 15

*Klein v. Earth Elements, Inc.,*
 59 Cal. App. 4th 965 (1997)............................................................................. 19

*Kohler Co. v. Baldwin Hardware Co.,*
 82 U.S.P.Q.2d 1100 (T.T.A.B. 2007)............................................................... 16

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
 571 F.3d 873 (9th Cir. 2009)...................................................................... 13, 14

*Matek v. Murat,*
 862 F.2d 720 (7th Cir. 1987)........................................................................... 23

*Maxim Integrated Products, Inc. v. Quintana,*
 654 F. Supp. 2d 1024 (N.D. Cal. 2009) .......................................................... 19

*McKell v. Washington Mut., Inc.,*
 142 Cal. App. 4th 1457 (2006)........................................................................ 20

*Mortgage Elec. Registration Sys. v. Brosnan*, Case No.
 C 09–3600 SBA, 2009 WL 3647125 (N.D. Cal. Sept. 4, 2009) ...................... 19

*Mortgage Elec. Registration Sys.,* Case No.
 C 09–3600 SBA, 2009 WL 3647125 ........................................................ 20, 24

*Ms. World (U.K. ) Ltd. v. Mrs. America Pageants, Inc.,*
 856 F.2d 1445 (9th Cir. 1988)......................................................................... 15

*Official Airline Guides, Inc. v. Goss,*
 6 F.3d 1385 (9th Cir. 1993)....................................................................... 16, 18

*One Industries, LLC v. Jim O'Neal Distributing, Inc.*,
578 F.3d 1154 (9th Cir. 2009) ........................................................................ 14

*Palantir Technologies Inc. v. Palantir.net, Inc.*,
No. C 07-03863 CRB 2008 WL 152339 (N.D. Cal. January 15, 2008) ........................ 16

*Rent-a-Center, Inc. v. Canyon Television & Appliance*,
944 F.2d 597 (9th Cir. 1991)..................................................................... 21, 22

*Rothschild v. Tyco Intl. Inc.*,
83 Cal.App. 4th 488 (2000) .............................................................................. 19

*Sardi's Restaurant Corp. v. Sardie*,
755 F.2d 719 (9th Cir. 1985) ........................................................................... 20

*Schnall v. Hertz Co.*,
78 Cal. App. 4th 1144 (2000) ........................................................................... 19

*Sengoku Works v. RMC Int'l*,
96 F.3d 1217 (9th Cir. Cal. 1996) .................................................................... 13

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
739 F.2d 1415 (9th Cir. 1984)........................................................................... 23

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*,
240 F.3d 832 (9th Cir. 2001)....................................................................... 12, 20

*Sunbeam Furniture Co. v. Sunbeam Co.*,
191 F.2d 141 (9th Cir. 1951).......................................................................... 18

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*,
846 F. Supp. 2d 1063 (N.D. Cal. 2012), appeal dismissed (Apr. 18, 2012) ............... 14

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................................................ 12

**Statutes**

15 U.S.C. § 1125(a) ...................................................................................... 13

Cal. Code Civ. Proc. § 1209 ............................................................................ 20

California Business and Professions Code Section 17200 ..................................... 19

Fed. R. Civ. P. 65(c) ...................................................................................... 23

**Other Authorities**

Andrew J. Zammit, *Virtual Currencies – A Question of Trust*, CSB Advocates, Mar. 11, 2013....... 21

McCarthy, Trademarks & Unfair Competition § 27:5A, at 250-251 (1973)................... 23

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on February 6, 2013, or as soon thereafter a counsel may be heard by the above-entitled Court, Plaintiff Ripple Labs, Inc. f/k/a OpenCoin, Inc. ("Ripple Labs") will move and hereby moves this Court for a preliminary injunction enjoining Defendants LaCore Enterprises, LLC ("LaCore Enterprises"), Rippln, Inc. ("Rippln"), and Terry LaCore ("Mr. LaCore") (collectively, "Defendants") from using Ripple Labs' RIPPLE Trademark or any confusingly similar variation thereof in connection with Defendants' on-line business networking services.

Plaintiff brings this Motion on the grounds that it is likely to prevail on the merits of its lawsuit, that Plaintiff will suffer irreparable harm absent a preliminary injunction, and that the balance of equities and the public interest warrant the proposed injunction.  This Motion is supported by the accompanying Memorandum of Points and Authorities; Plaintiff's Complaint; the Declarations of Christian Larsen and Ashley Kessler and all exhibits thereto; any reply memorandum and reply Declarations that Plaintiff may file; any testimony, evidence, or oral argument that Plaintiff may present at the hearing; and any other materials that this Court may further consider.

## RELIEF REQUESTED

Plaintiff respectfully requests that the Court enter a preliminary injunction enjoining Defendants from using Ripple Labs' RIPPLE Trademark or any confusingly similar variation thereof, including RIPPLN, in connection with Defendants' on-line business networking services in order to prevent 1) further instances of actual confusion in the marketplace; 2) irreparable harm to Ripple Labs' reputation; and 3) harm to third-party customers of Ripple Labs.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   SUMMARY OF THE ARGUMENT

The parties to this trademark action are both on-line companies that operate in the world of virtual currency – an industry wherein consumer trust is of paramount importance, and consumer confusion of crucial concern to protect consumers against fraud and other misconduct and also those businesses, like Plaintiff herein, that have established trust among those consumers.

The similarities between the parties end there: while Plaintiff Ripple Labs is an established, well-respected, and highly legitimate on-line currency exchange service, known within the industry and major publications as the "next big thing" in virtual currency, Defendants operate a social networking platform that is essentially nothing more than an online pyramid scheme. And while Plaintiff has long used and established its now federally registered "RIPPLE" trademark[1] in connection with its business, Defendants are only now coming into the market looking to capitalize on Plaintiff's investment, using the identical "RIPPLE" mark and nearly identical "RIPPLN" mark in a concerted effort to trade off of Plaintiff's good will and reputation.

This is an exceptionally clear case of trademark infringement. Not only is consumer confusion highly likely in this case but actual confusion has already occurred. Indeed, although Defendants have only recently started to use "RIPPLE" and "RIPPLN" in commerce there have already been at least a dozen documented instances of actual confusion. This is not surprising given Defendants' use of identical and nearly identical marks in the same on-line space as Plaintiff. The instances of actual confusion are also increasingly exponentially as Defendants move steadfastly closer and closer to Plaintiff's established use of its "RIPPLE" trademark in complete disregard for Plaintiff's trademark rights.

The facts of this case support preliminary injunctive relief enjoining Defendants from further use of the RIPPLE and RIPPLN marks. As set forth herein, Ripple Labs is likely to prevail on its trademark infringement claim, based on, *inter alia*, the actual confusion that has resulted from Defendants' intentional use of the identical and nearly identical marks, the strength of Plaintiff's

---

[1] Plaintiff received two of its federal trademark registrations on December 24, 2013, only days before the filing of this action and this Motion.

RIPPLE trademark, the overlap between the goods and services in connection with which the parties are using the marks, and Defendants' bad faith in adopting Plaintiff's mark and exceedingly poor reputation in the industry.

Defendants' actions are calculated to, and actually do, deceive consumers about the source and quality of their services.  As a result, Defendants are harming consumers and potential consumers of Ripple Labs by intentionally causing confusion as to the source of Defendants' goods and services, and at the same time irreparably damaging the goodwill associated with Ripple Labs and its RIPPLE trademark.  The irreparable harm Ripple Labs is experiencing as a result of Defendants' actions is particularly amplified in the currency exchange industry, where consumer trust and reputation is essential for any currency exchange system to succeed.  Defendants have also engaged in cybersquatting by registering and using the domain names www.rippln.com and www.startmyripple.com with a bad faith intent to cause confusion with Ripple Labs' RIPPLE Trademark and to profit from such use.

In sum, Defendants have knowingly and without the consent of Ripple Labs used "RIPPLE" and "RIPPLN" in commerce in connection with the sale, offering for sale, distribution, and/or advertising of its services, and such activities are likely to, and actually do, cause confusion or mistake, and deceive consumers in the United States.  Moreover, the negative reputation associated with the Defendants will damage and will dilute the goodwill of Ripple Labs and its RIPPLE Trademark, including the strong and positive reputation Ripple Labs has developed in connection with its currency exchange services under the RIPPLE Trademark.   Preliminary injunctive relief is both appropriate and necessary in this case.

## II.    STATEMENT OF FACTS

### A.    Plaintiff Ripple Labs and the Ripple Trademark

Plaintiff Ripple Labs is a currency exchange service providing on-line, real-time currency trading and cash management.  Ripple Labs, under its trademark RIPPLE, facilitates the transfers of electronic cash equivalents and provides virtual currency exchange transaction services for transferrable electronic cash equivalent units having a specified cash value.  Ripple Labs is presently run by its CEO, Chris Larsen, ("Mr. Larsen"), an individual with an impeccable reputation in the

online banking world and beyond.  Mr. Larsen co-founded one of the first online lending institutions in the country, E-Loan, and later assisted in founding Prosper Marketplace, another revolutionary peer-to-peer online lending service.  These organizations would not have been possible without, *inter alia,* Mr. Larsen's credibility and integrity.

For many years, Ripple Labs has developed, maintained, and operated a hugely successful currency exchange service that provides on-line, real-time currency trading and cash management. *See* Declaration of Christian Larsen ("Larsen Decl. "), ¶ 1.  Specifically, Ripple Labs facilitates the transfers of electronic cash equivalents and provides virtual currency exchange transaction services for transferrable electronic cash equivalent units having a specified cash value.  (Larsen Decl., ¶ 2.)

Under its RIPPLE trademark, Ripple Labs offers services whereby individuals can create, credit, and disburse money—both real and virtual—to people within a peer-to-peer social network. (Larsen Decl., ¶ 3.)  This service acts as an alternative to the on-line currency exchange services presently in existence by offering a truly decentralized exchange service and also providing a platform by which individuals may grant or extend credit to one another.  (Larsen Decl., ¶ 4.)  The credit created under the RIPPLE trademark has become a new form of digital currency.  (Larsen Decl., ¶ 5.)

Ripple Labs is the exclusive owner of all rights, title, and interest in U.S. Trademark No. 4,453,543 for the word mark "RIPPLE: in connection with "Financial services, namely, providing secure payment options to members of an online community via a global computer network through the use of traditional currency and virtual currency" in international class 036.  Ripple Labs is also the owner of U.S. Trademark No. 4,453,376 for the word mark "RIPPLE COMMUICATIONS" for "Financial services and financial transaction services, namely, providing secure commercial transactions and payment options" in international class 036, as well as any and all common law rights and goodwill associated therewith.  True and correct copy of the Certificates of Registration are attached to Plaintiff's Complaint as Exhibits 1 and 2.  Ripple Labs' federal registrations in the RIPPLE trademark issued on December 24, 2013 and claim a first use date of August 31, 2004.  *Id.* Ripple Labs is also the owner of all common law rights in the RIPPLE mark, having used it either

directly or through its predecessors for almost ten (10) years. These rights are collectively referred to herein as the "RIPPLE Trademark."

**B.**     **Ripple Labs Has Extensively Promoted Its Services Using the RIPPLE Mark And RIPPLE Domain Names**

Ripple Labs and its predecessors have continuously used and extensively promoted the RIPPLE Trademark since 2004, first in the areas of computers and online communication services and more recently in connection with Ripple Labs' above described virtual currency services. (Larsen Decl., ¶ 6.) Ripple Labs has expended a tremendous amount of time, effort and money to continuously and widely advertise and promote the RIPPLE brand of currency exchange services, including but not limited to Bloomberg, various trade shows, Ripple Labs' website, third-party websites, and through social media outlets such as Facebook. (Larsen Decl., ¶ 7.) Most notably, Ripple Labs has given away hundreds of millions of dollars (approximately $40,000/day) in XRP, Ripple's form of digital currency. (Larsen Decl., ¶ 8.) Ripple Labs has secured itself as the number one team on the Community Computing Grid, ahead of IBM and other industry goliaths. (Larsen Decl., ¶ 9.) As a result, the RIPPLE Trademark has become widely recognized among the consuming public of the United States as a trusted service offered by Ripple Labs. (Larsen Decl., ¶ 10.)

Additionally, Ripple Labs has expanded the goods and services it offers under its RIPPLE Trademark abroad. This expansion has grown to countries including: United Kingdom, China, France, Australia, Benelux, Czech Republic, Denmark, Germany, Greece, Italy, Poland, Spain, Sweden, Colombia, South Korea, Canada, India, Russia, Japan, Mexico, Slovenia, Brazil and, of course, throughout the United States. (Larsen Decl., ¶ 11.) Ripple Labs owns two International registered trademarks in addition to its United States registered trademark(s), as well as 20+ pending International applications. (Larsen Decl., ¶ 12.)

Ripple Labs also owns all rights, title and interest in and to the URL domain names, http://www.ripple.com, http://www.ripple-project.org, and http://www.ripplepay.com (collectively, the "RIPPLE Domain Names") and all goodwill associated thereto. (Larsen Decl., ¶ 13.) The

RIPPLE Trademark has acquired additional goodwill through Ripple Labs' continuous and extensive use of the RIPPLE Domain Names.  (Larsen Decl., ¶ 14.)

### C.    The Defendants' Infringing Scheme

The Defendants provide network marketing services whereby Defendants compensate users in the form of Defendants' own virtual currency in connection with Defendants' social networking platform.  Additionally, Defendants provide advertisement opportunities to third parties, and offer an on-line payment system for sharing applications.  Defendants are using the identical mark RIPPLE and nearly-identical mark RIPPLN (the "Infringing Marks") in connection with these goods and services.  For example, Defendants are using the Infringing Marks in connection with one or more online platforms operated by the Defendants at the following websites: www.rippln.com, www.startmyripple.com and www.ripplncommunicator.com (collectively, the "Infringing RIPPLN Websites").  Defendants' goods and services include compensating users monetarily and through value equivalents in the form of Defendants' own virtual currency in connection with Defendants' social networking platform.  For example, Defendants are now using RIPPLE and RIPPLN in connection with an "incentivized sharing" concept (*i.e.*, getting paid for sharing), that has been called "the new model of currency," thereby associating themselves with currency and monetary value.  (Kessler Decl., ¶ 20, Exhs. Q and R.)

The Infringing RIPPLN Websites describe the following services offered by the Defendants under the Infringing Marks: "bring[ing] long-over due transparency to the social engagement business and has created a *new monetary model* for 'eyeball acquisition.'" (Kessler Decl., ¶ 1 (emphasis added).)  Users of the Infringing RIPPLN Websites have to be "invited" or "referred" by friends to join the platform.  (Kessler Decl., ¶ 2.)

Equally troubling is the substantial negative press associated with the Defendants, their Infringing Marks, and their Infringing RIPPLN Websites.  Several websites and blogs have characterized the Defendants' network application as a "scam" and a "scheme."  (Kessler Decl., ¶ 3, Exhs. A and B.)  One user writes:

> What is Rippln really, do you know that? Seems mostly like an MLM/Pyramid-ish scheme but I don't see any requirement for paying to sign up. Just a referral code

from someone who would deem you a fellow "chosen one"… sounds almost New Age-ish to me.

(Kessler Decl., ¶ 4, Exh. C).  Another user of the Infringing Website writes on the www.startmyripple.com blog, "RIPPOFF-LN…making people poorer every month since 2012." (Kessler Decl., ¶ 5, Exh. D.)  According to another consumer, Rippln's number of Facebook friends are inflated and Rippln is allegedly using "Friendblaster or a similar tool to create Facebook accounts to pad their stats and spam with."  (Kessler Decl., ¶ 6, Exh. D.)

Some of the negative attention to Defendants' services is attributable to Defendants' founder and owner, Terry LaCore, who has been investigated by the Securities Exchange Commission (SEC) on a separate business venture.  (Kessler Decl., ¶ 7, Exh. E.)  The foregoing are merely examples of the overwhelming criticism and negative publicity that the Defendants and their Infringing Marks have received.

**D.    Defendants' Wrongful and Infringing Conduct**

Defendants commenced use of the identical mark RIPPLE, and also adopted the nearly identical and confusingly similar mark RIPPLN, long after Ripple Labs and its predecessors established its rights and goodwill in connection with the RIPPLE Trademark, and after Ripple Labs began using the RIPPLE Trademark in connection with its virtual currency services.  (Larsen Decl., ¶ 15.)

Defendants now interchangeably use the marks RIPPLE and RIPPLN in relation to many of their activities, including those activities that overlap with the goods and services offered by Plaintiff under its RIPPLE Trademark.  For instance, Defendants' principal registration website is www.startmyripple.com. (Kessler Decl., ¶ 8, Exh. F.)  Created on April 7, 2013, the website's "about" page states that ""RIPPLN" is the 'active state of a ripple.""  (Kessler Decl., ¶ 9, Exh. G.) On its Official Facebook page, Defendants encourage potential users to "GET IN THE RIPPLE." (Kessler Decl., ¶ 10, Exh. H.)

Defendants' use of RIPPLE has progressed over time, moving toward Plaintiff's use, as Defendants have expanded their system to include online currency transfers.  Perhaps most notably, Defendants have recently started to call their leadership team the "Ripple Success Team."  (Kessler Decl., ¶ 11, Exh. I.)  Defendants' own website acknowledges the similarities they have no rights to

the term RIPPLE, yet continue to use it as a trademark.  (Kessler Decl., ¶ 12, Exh. J.) ("Rippln is the name of the company…you may use the names Ripp, Rippl or Ripple.").  By using the Infringing Marks to promote their untrustworthy services, Defendants are irreparably damaging the goodwill associated with the RIPPLE Trademark.

Furthermore, Defendants also then launched a new application called "RIPPLN Communicator," available at www.ripplncommunicator.com, a program that furthers infringes Ripple Labs' rights, by allowing subscribers to keep in touch, share, and earn rewards (including Defendants' virtual currency).  (Kessler Decl., ¶ 13, Exh. K.)  Public information about the Rippln Communicator application indicates that the application is a program for information exchange, including SMS messages, online chat messages, and digital media such as pictures.  *Id.*

In furtherance of Defendants' scheme to unfairly and illicitly capitalize off of the goodwill and reputation of Ripple Labs' RIPPLE Trademark, Defendant LaCore Enterprises filed U.S. Trademark App. Ser. No.  85/758,124 on an intent-to-use basis for the mark RIPPLN ("the '124 application").  The '124 application seeks registration in International Class 035, and more specifically, in connection with "Network marketing, namely, business marketing services."  LaCore Enterprises also filed U.S. Trademark App. Ser. No.  85/758,099 on an intent-to-use basis for the mark RIPPLN ("the '099 application").  The '099 application seeks registration in International Class 042 in connection with "Computer services, namely, hosting electronic facilities for others … creating an on-line community for registered users to organize groups, events, participate in discussions, share information and resources … form virtual communities, and engage in social networking featuring social media …" Copies of the '124 application and '099 application are attached to Plaintiff's Complaint as Exhibits 2 and 3.

On May 24, 2013, Ripple Labs filed a Notice of Opposition with the United States Patent and Trademark Office, requesting that the Trademark Trial and Appeal Board deny the '124 application and the '099 application on the grounds that the Infringing Mark, RIPPLN, is confusingly similar to Ripple Labs' RIPPLE Trademark pursuant to Section 2(d) of the Trademark Act.

**E.     Actual Confusion is Occurring at an Increasingly Exponential Rate**

1
2
3
4
5
6

Defendants' infringing conduct has confused consumers as to the source of Defendants' services, misleading consumers into confusing Defendants' services with those of Ripple Labs, and Defendants have wrongfully benefited from their improper association with the RIPPLE Trademark. Although Defendants have only recently started to use the Infringing Marks in commerce, there have already been at least a dozen documented instances of actual confusion with Ripple Labs' RIPPLE Trademark.

7
8
9
10
11
12

On one occasion, Ripple Lab's CEO and Co-Founder Mr. Larsen was approached by an acquaintance from his son's soccer team who received an invitation to join the Infringing RIPPLN Website, and was under the impression that Ripple Labs and Mr. Larsen were associated with the social networking scheme.  The user signed up for the Rippln website, solely because he thought it was associated with Mr. Larsen.  (Larsen Decl., ¶ 18.)  This highlights the risk associated with Defendants' use of the Infringing Marks.

13
14
15
16

Mr. Larsen was thereafter approached by his personal trainer, Milton Quining.  Mr. Quining excitedly told Mr. Larsen that his daughter got the invitation for "Ripple" and "signed right up."  In fact, Mr. Quining's daughter had signed up for the Rippln service—not for Ripple Labs' service—because she was under the impression that it was associated with Ripple Labs and Mr. Larsen.

17
18
19
20
21

Thereafter, on April 26, 2013, users communicating on a Bitcoin Talk Forum were similarly under the impression that RIPPLE and RIPPLN were associated with one another, and were under the false impression that users needed an invitation to take advantage of RIPPLE services, as they did with the RIPPLN service.  It wasn't until a Ripple Labs employee corrected the users, that they realized the two services were unaffiliated.  (Larsen Decl., ¶ 19, Exh. A.)

22
23
24
25

On May 10, 2013, Alan Safahi, founder and CEO of ZipZap, Inc. and a business colleague of Mr. Larsen's, contacted Mr. Larsen to inquire whether he was familiar with the website www.startmyripple.com, and further stated that Mr. Safahi's clients were confused about the relationship between the parties.  (Larsen Decl., ¶ 20, Exh. B.)

26
27
28

Next, on May 11, 2013, in a discussion board called RippleForum on Ripple Labs' website, one user inquired about the relationship between RIPPLE and RIPPLN, and if they were one in the

same. (Kessler Decl., ¶ 15, Exh. L.)  Another RIPPLE user corrected the confusion, noting that the two were "completely unaffiliated" and added:

> … It's easy to mix the two up for newcomers I think some of the people who got hyped about Rippln will stumble upon Ripple, which might be a beneficial side effect; Ripple is mostly know by BTC [Bitcoin] enthusiasts for now. I just hope there won't be too much confusion and that the two will become distinguishable….

*Id.*

Similarly on another discussion forum, www.wickedfire.com, an additional instance of actual confusion occurred, wherein one user explains to the other the difference between the two services:

> 'Rippln' and 'Ripple' are two different things. 'Rippl**e**' is meant to be a virtual currency gateway that is due to launch, that allows you to exchange BTC [bitcoin] for fiat or whatever you want. That's what's been incorporated into Bitstamp. 'Rippl**n**' is a pyramid ponzi scheme. One is trading on the other's name to attract members....

(Kessler Decl., ¶ 16, Exh. M (emphasis added)).

Instances of actual confusion are also evident on the blog article, "Underneath the Slimy Ripples of RIPPLN," wherein the author accuses Defendants' operation as being a "sleazy pyramid scheme."  (Kessler Decl., ¶ 17, Exh. N.)  A commentator on the blog interjects its criticisms of the RIPPLE Trademark under the assumption that the site was a discussion forum that was somehow affiliated with Ripple Labs.  In fact, the article and accompanying criticism is dedicated to a discussion of Defendants' services and confusingly similar Infringing Marks.  *Id.*

Recently, there was an additional documented instance of actual confusion on the forum site, www.FinanzaOnline.com.  The conversation in the forum appears in Italian, but, in short, one user had to clarify the difference between RIPPLE and RIPPLN because there was confusion amongst the users.  (Kessler Decl., ¶ 18, Exh. O.)

Yet another instance of actual confusion occurred on the website www.upriser.com wherein one user recognizes the two as technically different, but insinuates both are scams given RIPPLN's reputation:

> Very strange that they chose the name Rippln. There is a Bitcoin type currency called Ripple that gets a lot of the same type scam insinuations. I am not a fan of Ripple and

do not use social media enough to make a judgement [sic] on Rippln but I also do not believe in coincidence. I would use caution with both Ripples. :)

(Kessler Decl., ¶ 19, Exh. P.)

In view of the foregoing examples, it is both abundantly clear and unfortunate that actual confusion between the Infringing Marks and Ripple Labs' RIPPLE Trademark is increasing exponentially as Defendants' use of the Infringing Marks continues.

> **F.    Defendants Advertise Themselves as Being Associated With Monetary and Currency Exchange Services Leading to Further Actual Confusion**

As evidenced by the foregoing repeated instances of actual confusion, Ripple Labs' and Defendants' respective services are both related and overlapping.  Defendants encourage this confusion by promoting and associating the Infringing Marks with Ripple Labs' services, specifically, currency exchanges and financial transactions, namely payment systems with real and virtual currency.  As discussed briefly above, Defendants' users and promoters suggest that RIPPLN's "incentivized sharing" concept (*i.e.*, getting paid for sharing), could be called "the new model of currency," thereby associating themselves with currency and monetary value.  (Kessler Decl., ¶ 20, Exhs. Q and R.)

Defendants' official Pinterest page further demonstrates that Ripple Labs and Defendants share overlapping markets as follows: "It's coming so instead of riding the wave be a part of it and make your own currency."  (Kessler Decl., ¶ 21, Exh. S.)  Defendants further boast, "[t]his transparency will become the new currency" such that users can "accumulate[] points… and earn rewards of real value, because you helped create real value." (Kessler Decl., ¶ 22, Exh. T.)  Furthermore, in some of Defendants' web-based applications, users "have the ability to instantly purchase in-game items *like currency*, perks, and new items that you could earn for free the hard way."  (Kessler Decl., ¶ 23, Exh. U (emphasis added).)

The overlap is becoming so pronounced that RIPPLE users are issuing statements to other RIPPLE users, warning of confusion.  For example, the following statements were posted on www.reddit.com, on a blog titled *"Be careful - Rippln is not Ripple, it's a pyramid scam that's trading on Ripple's name"*:

The three guys behind Rippln (note the "n" at the end) are Brian Underwood, Jonathan Budd and Russell Brunson and they all have previous as MLM scammers. It's definitely a bad scene. I'm worried about the bad associations being formed as we speak between the name "Ripple" and these hucksters.  Once those associations are cemented, then even if Rippln disappears the fallout will remain. "Have you heard about Ripple?" "Isn't that the app scam everyone was spamming me about 4 months ago?"

Of course, if Opencoin [Ripple Labs] plans on selling Ripple applications to businesses who then use the service with private branding in their companies, then it won't be as big a deal. But I still would think Opencoin [Ripple Labs] would be on top of this, and according to David Schwartz, they are.

(Kessler Decl., ¶ 24, Exh. V.)

In addition to the foregoing, Defendants are touting their new Chat App "Rippln Communicator."  This new feature directly infringes Ripple Labs' RIPPLE Trademark, which has secured trademark registration in connection with financial services and telecommunication services.

In sum, it is clear that the Defendants are infringing Ripple Labs' RIPPLE Trademark in a concerted effort to trade off of Plaintiff's goodwill and reputation, and in the process harming both consumers and Ripple Labs.

## III.   ARGUMENT

### A.   Legal Standard

To obtain a preliminary injunction, a party "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, No. 12-16868 (9th Cir. Dec. 2, 2013) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  With respect to claims of trademark infringement, to establish a likelihood of success on the merits a party must show that it is "(1) the owner of a valid, protectable mark, and (2) that the alleged infringer is using a confusingly similar mark." *Id.* (quoting *Grocery Outlet, Inc. v. Alberston's, Inc.*, 497 F.3d 949, 951 (9th Cir. 2007)).  "Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm." *Id.* (citing *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001)).  Public policy concerns also favor the granting of an

injunction when an infringing product is likely to cause consumer confusion.  *See Anti-Monopoly, Inc. v. General Mills Fun Group,* 611 F.2d 296, 300-02 (9th Cir. 1979).

### B.   Ripple Labs Will Prevail On Its Section 1114 and 1125 Trademark Infringement Claims

The first element of Ripple Labs' Lanham Act trademark infringement claims is easily satisfied.  Ripple Labs is the exclusive owner of the federally registered RIPPLE Trademark.  A Certificate of Registration from the USPTO is *prima facie* evidence of a valid and protectable trademark.  *Brookfield Communications, Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1047 (9th Cir. 1999).[2]  Additionally, at an absolute minimum, Ripple Labs has proven by a preponderance of the evidence (throughout the concurrently-filed Larsen Declaration) that Ripple Labs "used the mark in commerce first."  *Sengoku Works v. RMC Int'l*, 96 F.3d 1217, 1219-20 (9th Cir. Cal. 1996), thus establishing a likelihood of success on the merits regarding Ripple Labs' ownership of the marks at issue.

The standard for finding trademark infringement for a registered trademark, or alternatively under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is the same: namely, whether the defendant is using, in commerce, any false or misleading word or representation which is likely to cause confusion in the marketplace.  *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009); *Accuride International, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1532 (9th Cir. 1989).  To evaluate the likelihood of confusion between two names, courts apply the eight-factor test set forth in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), examining: (1) the strength of plaintiff's mark; (2) the proximity of the parties' goods or services in the marketplace; (3) the similarity of the parties' marks; (4) any evidence of actual confusion; (5) marketing channel overlap; (6) the type of goods and degree of care likely to be exercised by purchasers; (7) defendant's intent in selecting their name or mark; and (8) the

---

[2] Ripple Labs received notice of the grant of federal trademark protection over its RIPPLE Trademark on December 24, 2013.  As such, Ripple Labs now immediately seeks preliminary injunctive relief upon receiving a presumptive entitlement to the mark – thereby alleviating this Court from expending additional time and resources that it would otherwise have to expend had the action been brought on common law rights with no applicable presumptions.

likelihood of expansion of the parties' product lines.  *See Marlyn Nutraceuticals*, 571 F.3d at 877; *Accuride*, 871 F.2d at 1533-34.

The relative importance of each *Sleekcraft* factor is case-dependent, varying based upon the nature of the facts at hand.  *See One Industries, LLC v. Jim O'Neal Distributing, Inc.*, 578 F.3d 1154, 1162 (9th Cir. 2009).  "Although some factors - such as the similarity of the marks and whether the two companies are direct competitors - will always be important, it is often possible to reach a conclusion with respect to likelihood of confusion after considering only a subset of factors." *Brookfield Communs, Inc.,* 174 F.3d at 1054.  Here, the most salient considerations are the instances of actual confusion, the strength of Plaintiff's mark, the similarity of the marks used by Defendants, the market overlap between the parties' goods and service offerings, and Defendants' wrongful intent, all of which weigh strongly in favor of granting preliminary injunctive relief.

### 1.        The Evidence Of Actual Confusion Strongly Favors An Injunction

Evidence "that use of the two [disputed] marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 353.  Here, Defendants' use of the Infringing Marks has already caused confusion among users and potential users of the services Ripple Labs offers under its RIPPLE Trademark.  *Supra*, ¶ II, E.  In fact, Defendants' actions have forced Ripple Labs to explain to its users that it has no connection to the Defendants or the RIPPLN Websites.  *Id.*; *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 846 F. Supp. 2d 1063, 1079 (N.D. Cal. 2012), appeal dismissed (Apr. 18, 2012) (where Sunearth received a number of complaints that Defendant's use of Sunearth's name was leading to substantial actual and potential confusion in the market for solar collectors, a market in which both Plaintiffs and Defendant directly compete, led to a finding of likelihood of confusion warranting a preliminary injunction).  The fact that consumers have been confused by Defendants' use of the Infringing Marks is compelling evidence that others are likely to be confused in the future.  *See Chronicle Pub Co., v. Chronicle Publications Inc.*, 733 F.Supp. 1371, 1377-78 (N.D.Cal. 1989).  "A showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion," and supports entry of a preliminary injunction in this case.  *See Color Me House, Inc. v. Discovery Commun's, Inc.*,

2013 U.S. Dist. LEXIS 44234, 18-19 (W.D.Wash. March 27, 2013) (granting preliminary injunction where actual confusion shown).

Where, as here, "there is uncontroverted evidence in the record that there has been actual confusion as a result of Plaintiff and Defendant's use of virtually identical names," a Court should find in favor granting a preliminary injunction. *See GSC Logistics, Inc. v. Star Galaxy Logistics, Inc.,* C 09-5886 SBA, 2010 WL 690200, *3-4 (N.D. Cal. Feb. 24, 2010) (granting a preliminary injunction on the grounds that a "majority of the *Sleekcraft* factors, including two of the three controlling troika, support Plaintiff's claim that Defendant's use of a confusingly similar trade name is likely to cause-and indeed, has caused-confusion.")

### 2.     The RIPPLE Trademark Is Strong And Well Known Nationwide

A trademark's strength is determined by viewing the mark in its entirety as it appears in the marketplace. *See Brookfield Communs, Inc.,* 174 F.3d at 1058. The spectrum of protectability and strength for trademarks is divided into four primary types of designations: (1) coined, fanciful or arbitrary; (2) suggestive; (3) descriptive; and (4) generic. Arbitrary or fanciful marks are the strongest and deemed inherently distinctive and entitled to protection. *Id.* at 1059.

The RIPPLE Trademark is a strong, arbitrary mark: "it requires a mental leap to go from [Ripple Labs'] mark to its services." *See also Palantir Technologies Inc. v. Palantir.net, Inc.,* No. C 07-03863 CRB 2008 WL 152339, at *8-9 (N.D. Cal. January 15, 2008 (explaining that "the more imagination required, the stronger the mark is" and quoting *Ms. World (U.K. ) Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1449 (9th Cir. 1988)). At an absolute minimum, Plaintiffs' mark is suggestive, and cannot be generic or descriptive. *See Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998).

Further, while not required due to the federal registration, the RIPPLE Trademark has also acquired secondary meaning. Ripple Labs has expended substantial time, labor, skill, and expense in developing, advertising, and promoting the RIPPLE Trademark. (Larsen Decl. ¶¶ 7-14.) The RIPPLE Trademark enjoys widespread recognition and is prominent in the minds of consumers. *Id.*

### 3.     Defendants Are Using The Identical Name RIPPLE And The Nearly Identical Mark RIPPLN

Similarity of marks is assessed "in terms of their sight, sound, and meaning." *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1392 (9th Cir. 1993) (citations omitted).  The similarity of the parties' marks "has always been considered a critical question in the likelihood-of-confusion analysis."  *See GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 n. 5 (9th Cir. 2000).  In comparing the parties' marks, the court is required to focus on how each of the marks is perceived by the ordinary consumer in the marketplace.  *Brookfield Communs Inc.,* 174 F.3d at 1054; *Dreamwerks Prod. Group, Inc. v. SKG Studio,* 142 F.3d 1127, 1131 (9th Cir. 1998).  The "greater the similarity between the two marks at issue, the greater the likelihood of confusion."  *GoTo.com,* 202 F.3d at 1206.  In making this comparison, "similarities [are] weighted more heavily than differences."  *Brookfield Communs, Inc.,* 174 F.3d at 1054.  Likelihood of confusion is even greater when an infringer uses the exact trademark.  *GoTo.com,* 202 F.3d at 1206; *Kohler Co. v. Baldwin Hardware Co.,* 82 U.S.P.Q.2d 1100 (T.T.A.B. 2007).

Here, Defendants are using marks that are identical to the RIPPLE Marks.  It is also clear that the sight, sound and meaning of the RIPPLN mark is so similar that this factor weighs in favor of a finding of a likelihood of confusion.  The most blatant example of the similarity is the fact that Defendants adopt and use the marks RIPPLE and RIPPLN interchangeably to describe their services. This factor weighs strongly in favor of an injunction in this case.  *See also Palantir Technologies Inc.,* 2008 WL 152339, at *12 (granting preliminary injunction in trademark action where the marks at issue were identical).

### 4.     Defendants Have Acted In Bad Faith

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft,* 599 F.2d at 354.  The Ninth Circuit has held that the Defendants' intent is a critical element in determining the likelihood of confusion.  *See Interstellar Starship Serves., Ltd. v. Epic, Inc.*, 184 F.3d 1107, 1111 (9th Cir. 1999) ("intent to deceive is strong evidence of a likelihood of confusion").  "Where an alleged infringer chooses a mark he knows to be similar to another, one can

infer an intent to confuse." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1148 (9th Cir. 2002). This is because "'[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived.'" *Entrepreneur Media*, 279 F.3d at 1148. "This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Brookfield Communs, Inc.,* 174 F.3d at 1059.

Here, Defendants' bad faith intent is evidenced at least by the striking similarity between Ripple Labs' RIPPLE Trademark and the Infringing Marks.  Moreover, Defendants' conduct over the past year clearly indicates their intent to infringe Ripple Labs' brand and mark in an effort to unfairly profit from the goodwill earned by Ripple Labs' success in the market.  Notably, Defendants filed Intent-to-Use applications for the word mark RIPPLN on October 18, 2012.  Before Defendants began actual use of the mark, Ripple Labs filed its oppositions to those applications. Defendants then knowingly proceeded to go forward using both RIPPLN and also RIPPLE. Defendants were thus entirely aware of Ripple Labs and its RIPPLE Trademark prior to commencing use of the Infringing Marks, and have taken steps to create the appearance of a connection or affiliation between the two.  In addition, in March 2013, prior to the official launch of the RIPPLN Websites, Rippln's Chief Marketing Officer attempted to add Larsen as a friend on LinkedIn.  (Larsen Dec., ¶ 16.)  Despite knowledge of Ripple Labs' RIPPLE Applications and Registrations with the USPTO, Defendants continued to pursue the registration of their applications with the USPTO and internationally.

These and other facts demonstrate Defendants' intentional decisions to use the exact same name "RIPPLE," and confusingly similar name "RIPPLN," in order to tread on Ripple Labs' goodwill and experience in the industry.  Accordingly, this factor overwhelmingly weighs in favor of a finding of likelihood of confusion.

5.      **Defendants' Services Are Related To The Services Offered Under The RIPPLE Trademarks And Are Promoted To The Same Consumers In Overlapping Channels Of Trade**

Services are related when the marks as used are related in the minds of the consuming public. *Sleekcraft,* 599 F.2d at 348 (services are related where the buying public would reasonably believe they came from the same source if offered under the same mark).  The more well-known a mark, the more likely that its use on noncompetitive products will cause consumer confusion.  *Sunbeam Furniture Co. v. Sunbeam Co.,* 191 F.2d 141 (9th Cir. 1951).  Likewise, convergent marketing and sales channels increase the likelihood of confusion.  *Sleekcraft,* 599 F.2d at 353.

Defendants are actively using the Infringing Marks in connection with the Infringing RIPPLN Websites, and, as previously mentioned, in the short time Defendants have been offering their services, Defendants have received significant negative attention, publicity and notoriety. Notwithstanding this negative publicity, the services provided by Defendants under the Infringing Marks are unquestionably related to Ripple Labs' services, and are promoted through overlapping market channels.  *See, e.g., Palantir Technologies, Inc.*, 2008 WL 152339, at *5-6 (goods and services related where companies both offered products and services to the computer software industry using identical marks).  Moreover, given Defendants' purposeful intent to link itself to monetary and currency exchange services, marketplace overlap is inevitable.  Thus, these factors weigh heavily in favor of both a likelihood of confusion and injunctive relief

6.      **Defendants Intend To Expand Their Services To Further Compete With Ripple Labs**

Beyond the existing commonality of the channels of trade between the parties, "[a] strong likelihood that either party may expand his business to compete with the other favors a finding of infringement."  *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1394 (9th Cir. 1993).  Not only have Defendants already entered into the same space as Ripple Labs, but Defendants indicate in their advertising an intent to expand the scope of their services further through the RIPPLN Websites. Further, Defendants are advertising in many of the same countries that Ripple Labs' services under the RIPPLE Trademark are available.  *See Maxim Integrated Products, Inc. v. Quintana*, 654 F.

Supp. 2d 1024, 1034 (N.D. Cal. 2009) (where the Court held that the likelihood of expansion of the parties' products internationally weighed in Plaintiff's favor).  Defendants further advertise the recent launch of their new application software RIPPLN COMMUNICATOR, which is again strikingly similar in sight, sound and meaning to Ripple Labs' RIPPLE Trademark. Therefore, this factor also tips strongly in Ripple Labs' favor.

In sum, Ripple Labs is likely to prevail on its trademark infringement claims, and this factor strongly supports entry of a preliminary injunction in this case.

### C.   Ripple Labs Will Also Prevail On Its Unfair Business Practices Claims

Section 17200 of the California Business and Professions Code makes actionable any business practice that is unlawful, unfair or fraudulent.  *Mortgage Elec. Registration Sys. v. Brosna*, Case No. C 09–3600 SBA, 2009 WL 3647125, at *8 (N.D. Cal. Sept. 4, 2009) (where the Court found noteworthy that Defendants adopted an infringing name for its "sham companies").  Section 17200 imposes strict liability on defendants.  *Id.*  It is, therefore, not necessary to show that the defendant intended to injure anyone in order to prevail on a Section 17200 claim.  *Community Assisting Recovery, Inc. v. Aegis Ins. Co.,* 92 Clap. 4th 886, 891 (2001); *Rothschild v. Tyco Intl. Inc.,* 83 Clap. 4th 488, 494 (2000).  Ripple Labs is likely to prevail on its Unfair Business Practices claims because Defendants are unfairly, fraudulently and unlawfully causing confusion among consumers.

The unfairness prong of California's unfair competition law is intentionally broad, allowing courts the maximum discretion to prohibit new schemes to defraud.  *Schally v. Hertz Co.,* 78 Cal. App. 4th 1144 (2000).  A business practice is unfair when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.  *See Community Assisting Recovery, Inc. v. Aegis Security Ins. Co.,* 92 Cal. App. 4th 886 (2001), *rev. denied* (2002).  In order to determine whether a business practice or act is unfair, courts examine the impact of the practice or act on its victim, balanced against the reasons, justifications and motives of the alleged wrongdoer.  *See Emery v. Visa Internet Service Assn.*, 95 Cal. App. 4th 952 (2002).  In essence, courts weigh the utility of the defendant's conduct against the gravity of the harm.  *See Klein v. Earth Elements, Inc.,* 59 Cal. App. 4th 965, (1997).  Fraudulent business

practices, on the other hand, may be based on any representations to the public that are accurate on some level, but will nonetheless tend to mislead or deceive.  *see McKell v. Washington Mut., Inc.,* 142 Cal. App. 4th 1457 (2006).  The unlawful business practices actionable under Section 17200 include any business practices that violate any law.  Cal. Code Civ. Proc. § 1209(a)(8); *see also Farmers Ins. Exch. v. Sup. Ct.,* 826 P.2d 730 (Cal. 1992) (1992).  In effect, Section 17200 makes a violation of any underlying law a per se violation of Section 17200.  *See Kasky v. Nike, Inc.,* 27 45 P.3d 243 (Cal. 2002); *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 973 P.2d 527 (Cal. 1999).

Here, as set forth in detail above, Defendants continued their social media scheme under the names RIPPLE and RIPPLN, and pursued federal registration of the RIPPLN mark, despite their knowledge of Ripple Labs and its RIPPLE Trademark.  Even if Defendants were not aware of the RIPPLE Trademark prior to filing their own federal trademark applications, they were made aware shortly thereafter (through the opposition proceeding commenced by Ripple Labs), and have failed to cease their unlawful activities.

### D.       Ripple Labs Has Suffered Irreparable Harm

Ripple Labs has suffered irreparable harm as a result of Defendants' unlawful and infringing activities.  The loss of control over the movant's name and reputation and loss of goodwill has consistently been held to constitute irreparable injury.  *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 724 (9th Cir. 1985).  The Ninth Circuit has recognized that the potential loss of good will or the loss of the ability to control one's reputation may constitute irreparable harm for purposes of preliminary injunctive relief.  *See Mortgage Elec. Registration Sys.,* Case No. C 09–3600 SBA, 2009 WL 3647125, at *8 (*citing Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."); *Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 526 (9th Cir. 1984) (finding irreparable injury where "district court could reasonably have concluded that continuing infringement would result in loss of control over Apple's reputation and loss of good will").  The loss of good will and damage to reputation are considered irreparable due to the inherent difficulty in quantifying such loss.  *See Rent-a-Center,*

*Inc. v. Canyon Television & Appliance*, 944 F.2d 597, 603 (9th Cir. 1991); *SunEarth, Inc.*, 846 F. Supp. 2d at 1083.

As this district court explained in *Clamp-Swing Pricing Co. v. Super Mkt. Merch. & Supply, Inc.*: "Inferior quality of an infringing product can constitute irreparable harm."  2013 U.S. Dist. LEXIS 166638, *13 (N.D. Cal. Nov. 21, 2013) (granting a preliminary injunction on plaintiff's trade dress claim).  In *Clamp-Swing*, the court found persuasive the fact that – like here – the Plaintiff's products were recognized as superior to Defendants, and where, as a result, the Plaintiff would "likely suffer irreparable harm to its reputation, and as a result lose customers, if an injunction does not issue."  *Id.* at *17.

Here, Ripple Labs has established a name and reputation for the RIPPLE Trademark. (Larsen Decl., at ¶¶ 1-14.)  Ripple Labs is known within the industry and other major publications as the "next big thing" in virtual currency.  *Id.*  Furthermore, all monetary exchange systems "innately share a fundamental risk" and require a significant amount of consumer trust.  Andrew J. Zammit, *Virtual Currencies – A Question of Trust*, CSB Advocates, Mar. 11, 2013, http://www.csb-advocates.com/malta-law-articles/virtual-currencies-question-trust.  Indeed, many monetary exchange systems are not regulated and do not involve any kind of supervision or oversight.  *Id.* Thus, it is self-evident that any negative impact to this trust is irreparably damaging to the system.  It is therefore undisputable that the association of the RIPPLE Trademark with an alleged "pyramid scheme" and untrustworthy platform is particularly harmful to Ripple Labs' established reputation and goodwill.  Current or potential customers may wonder, and do wonder, based on the evidence presented if Ripple Labs is endorsing the Infringing RIPPLN Websites, or otherwise changed its practices and procedures in a way that would render Ripple Labs' services less desirable or reliable, or even subservient to the newly formed company now bearing the same name and mark.

As previously stated, Defendants' marketing under the Infringing Marks has already led to actual consumer confusion in the market.  Moreover, Ripple Labs has shown a continued likelihood of confusion in the relevant market between the RIPPLE Trademarks and the Infringing Marks. Current or potential customers' association of Ripple Labs with another entity, particularly the Defendants, directly harms the goodwill painstakingly acquired over years in the market and further

eliminates the ability of Ripple Labs to control its own reputation and good will.  Both the loss of goodwill and the loss of control of goodwill constitute irreparable harm that cannot be avoided absent a preliminary injunction.  *See Apple Computer* 725 F.2d at 526; *Rent-a-Center* 944 F.2d at 603.  Accordingly, given the likelihood of confusion that will result to consumers, as well as the resulting loss of control over Ripple Labs' reputation, goodwill, and the RIPPLE Trademark, Ripple Labs is likely to suffer irreparable harm absent preliminary injunctive relief.

**E.      The Balance Of Hardships and Public Interest Strongly Favors Ripple Labs**

Finally, the balance of the equities and public interest also weigh heavily in favor of a preliminary injunction against the Defendants.  In determining whether to grant injunctive relief, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *See Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987).  As explained, Ripple Labs has expended substantial time and expense developing the quality, reputation, and goodwill associated with the RIPPLE Trademark.  (Larsen Decl., ¶¶ 1-14.)  As also discussed above, Defendants' acts are causing immediate, irreparable harm to Ripple Labs that urgently requires injunctive relief.  If Defendants are permitted to continue their illegal practices, Ripple Labs will continue to suffer substantial damage to its reputation as well as losses to its revenue and erosion of its customer base.  (Larsen Decl. ¶ 23.)  *See Clamp-Swing,* 2013 U.S. Dist. LEXIS 166638, * 17 (explaining that "[a]n injunction also favors the public interest as the public interest is served where an injunction prevents customer confusion.") (citing *Internet Specialties West, Inc. v. Milon-Digiorgio Enters*, 559 F.3d 985, 993 (9th Cir. 2009) (in turn noting that "the usual public interest concern in trademark cases:  avoiding confusion to consumers.").

On the other hand, Defendants have no lawful right to a website built from intellectual property they stole from Ripple Labs.  Defendants went forward and adopted the RIPPLN and RIPPLE marks after having had full knowledge of Plaintiff's trademark rights, and cannot now be heard to complaint of any hardship as a result of being required to cease their infringing activities.  As such, issuance of a preliminary injunction will impose no legitimate or legally recognizable hardship on Defendants.

Here, both equity and the public interest clearly weigh in favor of the requested relief. The basic function of a preliminary injunction is to preserve that status quo pending a determination of the outcome on the merits. *See Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 704 (9th Cir. 1988); *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). The "status quo" in this case is the situation as it existed before Defendants began using the Infringing Marks in the United States, and prior to Defendants' entrance into the marketplace and promotion and use of the Infringing Marks. *GoTo.com*, 202 F.3d at 1210.

In addition to the equitable goal of maintaining the status quo, the Lanham Act's status as a consumer protection statute further weighs heavily in favor of preliminary injunctive relief under § 43(a):

> Since § 43(a) was passed as a consumer protection statute, the courts are not reluctant to allow a commercial plaintiff to obtain an injunction even where the likelihood of pecuniary injury to the plaintiff may be slight. . . . An injunction protects the consumer from continued false advertising. Money damages, on the other hand, primarily aid only the competitor, and he is required to satisfy a higher standard of proof as to injury.

*Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 753 n. 7 (8th Cir. 1980) (citing J. McCarthy, Trademarks & Unfair Competition § 27:5A, at 250-251 (1973)).

The public is best served by preventing the likelihood of confusion caused by Defendants' infringing use of the RIPPLE Trademark. Accordingly, this factor also weighs in favor of the preliminary injunctive relief requested by Ripple Labs.

## F.     It Is Within the Court's Discretion to Decline to Require a Bond Or, At a Minimum, to Require a Nominal Bond

Rule 65 of the Federal Rules of Civil Procedure requires the movant in a preliminary injunction proceeding to provide security in an amount the court considers proper to cover damages sustained by a party that is wrongfully enjoined, unless not warranted under the circumstances. Fed. R. Civ. P. 65(c); *see also Matek v. Murat,* 862 F.2d 720, 733 (7th Cir. 1987) (damages under injunction bond are limited to those actually and proximately resulting from the effect of the

injunction itself as opposed to litigation expenses independent of the injunction); *Mortgage Elec.*

*Registration Sys.,* Case No. C 09–3600 SBA, 2009 WL 3647125, at *8.

In this instance, the bond should be nominal or nothing at all because entry of a preliminary injunction will not harm the Defendants.  It is well within the Court's discretion at this juncture to require a nominal bond or no bond at all.  *See GoTo.com,* 202 F.3d at 1211 (ordering a nominal bond, noting that Rule 65(c) "places within the discretion of the district court the amount of the bond"); *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir. 2003) (nominal bond or no bond acceptable where there was no realistic likelihood of harm to defendant from enjoining its conduct).  Defendants simply have no right to cause marketplace confusion and harm Ripple Labs' reputation by using the RIPPLE Trademark, and therefore, this Court should, at a minimum, require Ripple Labs to post a nominal bond during the pendency of its injunction.

## IV.   CONCLUSION

Because Plaintiff Ripple Labs has demonstrated that it is likely to prevail on the merits of both its trademark infringement and unfair business practices claim and has suffered irreparable harm as a result of Defendants' infringing conduct, because the balance of hardships weighs in favor of injunctive relief, and because it is in the public interest to protect consumers from confusion resulting from Defendants' intentional misleading and wrongful conduct, Plaintiff Ripple Labs respectfully requests that a preliminary injunction issue in the proposed order submitted herewith.

Respectfully submitted,

By:  */s/ Jennifer Seraphine*
     Jennifer Seraphine (Cal Bar. No. 245463)
     (seraphine@turnerboyd.com)
     TURNER BOYD LLP
     2570 W. El Camino Real
     Suite 380
     Mountain View, California 94040
     Telephone: (650) 521-5930
     Facsimile: (650) 521-5931

     Todd M. Malynn (Cal. Bar. No. 181595)
     (tmalynn@feldmangale.com)
     FELDMAN GALE, P.A.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Promenade West
880 W 1st Street, #315
Los Angeles, California 90012
Telephone: (213) 625-5992
Facsimile: (213) 625-5993

*Attorneys for Plaintiff Ripple Labs, Inc.*